BRUCE O. BOETTCHER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boettcher v. Commissioner
Docket No. 5805-79.
United States Tax Court
T.C. Memo 1982-501; 1982 Tax Ct. Memo LEXIS 245; 44 T.C.M. (CCH) 997; T.C.M. (RIA) 82501; August 31, 1982. *245 Held: Petitioner's unreported income determined; fraud addition to the tax not sustained. Richard C. Smith, for the petitioner. Mark A. Pridgeon, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent has determined deficiencies in petitioner's Federal income tax and additions to tax pursuant to section 6653(b) [1] and in the alternative pursuant to sections 6651(a) and 6653(a) as shown by the following table: I.R.C.
I.R.C.
I.R.C.
Year
Deficiencies § 6653(b) § 6651(a) § 6653(a)
1967
$1,319.00
$659.50
$329.75
$65.95
1968
6,326.00
3,163.00
1,581.50
316.30
1969
4,491.00
2,245.50
1,122.75
224.55
1970
7,798.00
3,899.00
1,949.50
389.90
1971
4,272.00
2,136.00
1,068.00
213.60
1972
6,312.00
3,156.00
1,578.00
315.60
1973
3,795.00
1,897.50
948.75
189.75
1974
4,050.00
2,025.00
1,012.50
202.50
1975
7,908.00
3,954.00
1,977.00
395.40
1976
1,234.00
617.00
316.25
63.25 The sections 6651(a) and 6653(a) additions to tax were raised by respondent for the first time in his amended answer. Some of the facts have been stipulated and are found accordingly. The parties have stipulated that at the time of the filing *246 of the petition petitioner resided in New Richland, Minnesota. Petitioner did not file a Federal tax return for any of the years in issue, 1967 through 1976. The initial issue before the Court is whether or not petitioner realized taxable income or income from self-employment during any of these years. [2] *247 If the Court should find that petitioner did realize income upon which tax was due, then we must determine whether or not petitioner is liable for the addition to tax under section 6653(b)--civil fraud, or in the alternative to the additions to tax required by section 6651(a) for failure to file a return and section 6653(a) for negligence or intentional disregard of the rules and regulations. Respondent has the burden of proof as to all additions to tax, since the alternative to civil fraud was first raised in respondent's amended answer. The principal issue is wholly factual and depends in large measure upon an assessment of credibility of the witnesses for the parties. For a period of almost 20 years, prior to 1964, petitioner repeatedly engaged in criminal conduct and at various times was convicted and served sentences in Minnesota for grand larceny and burglary. He was finally released from prison in 1964 and, according to petitioner's testimony, determined that thereafter he would live within the law but with a very low profile. Apparently at that time he had substantial cash resources. Petitioner purchased a building in 1965 for a small sum of money, converted it into a modest residence and moved there with his wife and three children, where he and Mrs. Boettcher still reside. Petitioner's business activities until 1976, when according to his testimony he retired, consisted of purchasing small quantities of inexpensive merchandise from various sources and reselling the merchandise at flea markets and "barn sales," sometimes at auction and at other times directly to other individuals. Petitioner's business was, according to his testimony, conducted largely in cash, and he kept large amounts of cash on his person most of the time. *248 However, he also maintained savings accounts at several banks and periodically withdrew and deposited substantial sums of money from and into the various accounts, frequently transferring money from one account to the other. Petitioner's testimony is to the effect that he did not wish to file Federal income tax returns and that he therefore conducted his operations so that he would incur no liability for such taxes. He testified that he maintained accurate records on a running account basis from which he could calculate his net profit from his business and his interest income, and that whenever necessary to keep his net income during each year below the amount which would require the payment of individual income tax (based on the applicable tax tables for a married individual filing a joint return and claiming the number of dependents to which he was entitled), he would discontinue or slow down his business and if necessary withdraw cash from the banking institutions in order to stop the receipt of interest. Petitioner apparently lived very simply, paying cash for his needs, including the purchase of automobiles and an occasional vacation trip to Las Vegas. The source of petitioner's *249 initial cash hoard does not appear from the record, but the evidence of its existence is convincing. Petitioner's cash hoard upon investment generated interest income in amounts which have been stipulated, but based on this record, it does not create any inference as to other sources of income during the 10-year period. Possession of such amounts of cash, on the other hand, adequately explains petitioner's ability to purchase automobiles and to take vacation trips as well as to provide living expenses for his family over and above the net income which, according to petitioner's testimony, he generated each year from his business and from deposits in savings accounts. The deficiencies are based on detailed information contained in a logbook or journal maintained by petitioner to record his gross sales. Petitioner does not dispute the sales figures but claims that costs of goods sold should have been deducted from these amounts. Respondent, however, has predicated his case upon the hypothesis that petitioner stole the merchandise he sold and accordingly did not allow any adjustment for costs of goods sold. Respondent's interest in petitioner was a direct result of receipt from Minnesota *250 authorities of the gross sales book, which was confiscated from petitioner's residence and was delivered to respondent under the circumstances described below. Petitioner maintains that another logbook showing costs of goods sold was lost during the course of the same events. A search of petitioner's residence was carried out in September 1976 by a local Minnesota police officer accompanied by a deputy sheriff. The search was based on a search warrant issued by a county court, apparently with probable cause, to look for stolen merchandise; to wit, spark plugs. The police officer, Chester M. Nelson, accompanied by Deputy Sheriff Gumsolus found only Mrs. Boettcher at home although one of Mrs. Boettcher's daughters, Mrs. Feist, arrived while the search was in progress. Mr. Nelson found and confiscated a box of eight spark plugs, but apparently they were not the ones allegedly stolen. During the course of the search, Mr. Nelson opened a bedroom drawer over Mrs. Boettcher's protest and removed and confiscated papers. The question of what papers were actually removed is of critical consequence; and testimony on the point is in irreconcilable conflict. Mr. Nelson claims that he removed *251 only a single logbook, the gross sales logbook. Deputy Sheriff Gumsolus testified that Mr. Nelson had only one logbook when he left the house. On the other hand, both Mrs. Boettcher and Mrs. Feist testified that Mr. Nelson confiscated two books and other papers, putting the two books in his pockets. It is agreed that Mr. Nelson also confiscated a package of spark plugs. While Deputy Sheriff Gumsolus corroborates Mr. Nelson with respect to the single logbook and the spark plugs, he also testified that wrenches and tools were confiscated, a fact missed by all of the other witnesses. His testimony was vague and appeared to reflect an effort to support his fellow law officer. [3]
In accordance with Minnesota requirements, Mr. Nelson left at the residence a printed county form described as a "RECEIPT, INVENTORY AND RETURN." These types of printed forms apparently come in sets, with at least one copy being filed with the appropriate court which issued the search warrant. The copy left at the residence has printed at the bottom the words *252 "PREMISES/PERSON." This document was secured from a county court case file, at the court's request, and introduced in evidence as exhibit 16. On this form Mr. Nelson in his handwriting had inserted a two-line description of the property taken into custody. The descriptive language was "Box of 8 AC Spark Plugs" and "log book from bedroom." In each case, to the left of the description there is a figure in a circle. In the case of the spark plugs the figure is clearly a "1," whereas in the case of the logbook the figure is unclear and can be read as anything from one to eight. Another page out of the set of forms surfaced during the trial and is identified by the words "PEACE OFFICER" printed at the bottom. This document, also secured from the same county court file, is exhibit 15. Both documents have some information typed in printed blanks, such as Mr. Nelson's name, the name of the issuing judge and the date. Both appear to have been typed at the same time, as part of a single set. [4] However, on each the description of the property seized is original, written by Mr. Nelson in ink. The significance of these two documents lies in the fact that on exhibit 15, the figure in the *253 circle to the left is unmistakably a one. Mr. Nelson's explanation of the reason for the apparent discrepancy in the description was vague and unsatisfactory, as was most of his testimony. He was not a credible witness in this case. He apparently tried to explain the discrepancy in the description of the number of logbooks by at least implying that he filled out two separate sets of the forms at the residence and may have left the counterpart to exhibit 16 from the other set at the residence. As we have pointed out, however, both exhibits 15 and 16 appear to us to have come from a single set. Since the descriptions were in Mr. Nelson's handwriting, the apparent discrepancy may be simply unclear writing. But the importance of his testimony about these two exhibits lies in his efforts to concoct an unlikely explanation, one which is disputed by a careful examination of the two documents. [5] *254 Following the search, the two police officers returned to the county courthouse and Mrs. Boettcher was driven there by her daughter to be booked for possession of stolen property. Mrs. Feist testified that she was required to remain in the waiting room while her mother was being processed. She saw Mr. Nelson bring his camera into the waiting room along with two books which she accurately described as resembling the logbooks in question and commence to photograph the books until he noticed Mrs. Feist, at which point he gathered up the camera and books and left the room. Ultimately, the logbook showing the gross sales was delivered to another Minnesota police officer who arranged to have it copied and delivered a copy to an agent of the Internal Revenue Service. [6] The second logbook, along with other papers critical *255 to the determination of the costs of goods sold, all claimed to have been confiscated by Mr. Nelson, have not been located. The Court found Mr. and Mrs. Boettcher and Mrs. Feist to be forthright and convincing witnesses and, while the matter is not entirely free from doubt, the Court concludes that there was a second logbook and other important papers which were confiscated by Mr. Nelson and never returned to petitioner. The Court would reach this conclusion irrespective of the apparent discrepancy between exhibits 15 and 16 noted above. As already noted, that discrepancy is not nearly as important to the credibility of respondent's witnesses as the total failure of respondent to present an adequate explanation of an important item, albeit a possible "red *256 herring," and the patently incorrect and labored explanation attempted by respondent's witness, Officer Nelson. [7]
The Court finds that petitioner maintained records which were sufficiently accurate and complete to establish both his costs of goods sold and his gross sales, that the copy of the logbook in evidence correctly reflected petitioner's gross sales or gross receipts (with a minor exception--see footnote 9 below), that petitioner incurred substantial costs for the goods sold, and that through no fault of petitioner an essential portion of these records, that is the book recording the costs of goods sold, is missing. As pointed out, it is respondent's theory that petitioner incurred no costs for goods because he dealt in stolen goods. In addition to petitioner's prior record of larceny and burglary, respondent relies on several alleged shoplifting offenses which were disputed and, even if they took place, were minor items, treated as misdemeanors under Minnesota law. The evidence *257 showed that gross sales during this 10-year period averaged in excess of $16,000 per year and in four of the years were substantially in excess of $20,000. We find it impossible to believe that an individual such as petitioner with a criminal record for larceny and burglary could steal and sell this volume of merchandise year after year for a period of 10 years without his activities being discovered by police authorities. Certainly prior to 1964, petitioner was not able to conceal his illegal activities. Also, when the record of sales is examined, the obvious small value of the large number of individual items suggests that procurement by theft repeated frequently over 10 years could not have occurred. Thus, we do not find, as respondent requests, that petitioner incurred no cost for the goods which he sold. Petitioner testified convincingly to the effect that his average profit before considering his automobile costs was about 10 percent of his gross receipts. We accept this evidence as being reasonable and reliable under the circumstances. We attribute no significance, contrary to respondent, to the lack of witnesses who sold goods to petitioner. We do attribute significance *258 to respondent's lack of proof of stolen goods over a 10-year period. On balance, the record supports petitioner. Thus under the rule of Cohan,[8] we find that in each year petitioner realized a gross profit on such year's sales, as reflected in petitioner's logbook (exhibit 9-I), equal to 10 percent of such gross sales. [9] We further find that petitioner incurred automobile expenses in connection with his selling activities in the amounts set forth in the notice of deficiency, that petitioner realized interest income in the stipulated amounts and that petitioner was entitled to the number of exemptions in each year as determined by respondent. The foregoing is set forth in the following table: Adjusted
Gross
Auto
Business
Interest
Gross
Exemptions
Year
Profit
Expense
Net
Income
Income
1967
$962.50
$1,683
($720.50)
($720.50)
$3,000
1968
2,376.20
2,406
( 29.80)
$200
170.20 3,000
1969
1,736.90
1,458
278.90 1,202
1,480.90 3,000
1970
2,453.30
1,115
1,338.30 1,813
3,151.30 3,125
1971
1,635.20
895
740.20 2,269
3,009.20 3,375
1972
2,172.20
1,174
998.20 2,240
3,238.20 3,750
1973
1,530.70
999
531.70 1,722
2,253.70 3,750
1974
1,427.10
1,491
( 63.90)
2,803
2,739.10 3,000
1975
2,191.00
1,707
484.00 3,743
4,227    2,250
1976
535.80
670
( 134.20)
3,000
2,865.80 2,250
*259 From the above, it is clear that in all but three of the years the exemptions to which petitioner would be entitled will more than offset adjusted gross income, and in those three years the standard deduction will absorb the balance. The Court notes that respondent did not allow petitioner the standard deduction and used the tax rate schedules to compute the tax. However, the parties have stipulated that petitioner is entitled to the standard deduction. When the tax is recomputed pursuant to Rule 155, the standard deduction will be used, which will eliminate the small amount of income tax otherwise due pursuant to the foregoing table in the years 1970, 1975 and 1976. However, liability for self-employment tax remains to be considered. It is clear in this case that petitioner had an obligation to file Federal income tax returns in each of the years involved since gross income exceeded the section 6012 threshold amounts. In each year petitioner had self-employment income as defined in section 1402(b) and owed self-employment tax, even though no individual income tax was due and payable. [10] While petitioner's understanding of the income tax laws may have been deficient, he nevertheless *260 had the responsibility to inform himself. Moreover, the instructions as to making out income tax returns which respondent publishes each year, examples of which are included among the documents which petitioner reviewed periodically, are sufficiently detailed to put petitioner on notice of his obligation to pay self-employment tax. We do not, however, find that petitioner's actions in this regard were motivated by any intent to defraud the Government. Respondent has the burden of proof on all of their asserted additions to tax. Respondent has not carried the burden of proof with respect to the addition to tax under section 6653(b). Since petitioner does not owe Federal individual income tax on taxable income as redetermined pursuant to this opinion, we need not determine whether petitioner's failure to file returns and to pay the income tax under Chapter 1 was due to reasonable cause and not due to willful neglect. However, with respect to the self-employment tax, we do not excuse petitioner's failure to file returns and to pay that tax. Therefore, we find that petitioner's failure was due to negligence and that respondent *261 has carried his burden of proof with respect to the additions to tax under sections 6651(a) and 6653(a) as to self-employment tax. [11]
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Since the tax base for self-employment tax under section 1401 et seq. is gross earnings from self-employment less deductions attributable thereto, a taxpayer can in some circumstances owe self-employment tax but may offset adjusted gross income with personal deductions and exemptions so that no regular income tax is owed.
3. The witnesses were excluded from the courtroom; therefore, the recollection of Deputy Sheriff Gumsolus was not refreshed by the testimony of Mr. Nelson.↩
4. For example the "J" in the word "Judge" is elevated in the same fashion on both forms. ↩
5. Part of this trouble may be accounted for by the fact that neither petitioner nor respondent made any effort to procure exhibits 15 and 16 from the county court, relying instead on rather poor reproductions. These two exhibits were also exhibits in the attempted prosecution of petitioner and his wife, which ended in a return to petitioner of the spark plugs and a dismissal of the proceeding. However, it is unfortunate that the transcript of that proceeding, if transcribed was not available at this trial since the memories of witnesses were certainly fresher at that time.
6. Although petitioner on brief has characterized the search as illegal, and apparently the logbook was incorrectly seized, petitioner makes no contention here that the copy of the logbook used by respondent was tainted evidence. Based on this record, we find the evidence admissible. United States v. Janis,428 U.S. 433 (1976); Guzzetta v. Commissioner,78 T.C. 173 (1982); Black Forge, Inc. v. Commissioner,78 T.C. 1004↩ (1982).
7. If respondent had explained adequately the use of these forms, when filled out and by whom, where filed, and how and when exhibit 15 came to light, much of the mystery might have been eliminated.↩
8. Cohan v. Commissioner,39 F.2d 540↩ (2d Cir. 1930). 9. The figures in the logbook for a portion of 1967 apparently were net figures, that is, gross receipts minus the cost of goods sold; hence 10 percent of the annualized figure for the year 1967 would be slightly less than petitioner's actual profit, based on his testimony. However, the aggregate for the year 1967 is so small that this would be an insignificant adjustment.↩
10. See section 6017 and section 1.6017-1, Income Tax Regs.↩
11. We note that the section 6651(a) addition is imposed upon the "net amount due" and the section 6653(a)(1) addition is 5 percent of the underpayment. Since in this case the deficiency is only in self-employment tax, we need not decide how to apply the two additions in a case where we found that underpayment of Chapter 1 tax was due to reasonable cause but underpayment of Chapter 2 tax was due to neglect.↩