**UNITED STATES of America**

v.

**Charles M. MOUNT, Appellant.**

**No. 84–5111.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1984.

Decided March 26, 1985.

---

Neil H. Jaffee, Washington, D.C. (appointed by this court) for appellant.

Douglas J. Behr, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee. Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., entered an appearance for appellee.

Before WRIGHT and BORK, Circuit Judges, and HAROLD H. GREENE,[*] District Judge.

Opinion for the court filed by District Judge GREENE.

Concurring opinion filed by Circuit Judge BORK.

HAROLD H. GREENE, District Judge:

This is an appeal from a conviction of making a false statement in an application for a passport in violation of 18 U.S.C. § 1542. Appellant claims, first, that the District Court erred in failing to order the suppression of evidence seized by British police officers during the search of his residence in Great Britain, and second, that the evidence was insufficient to support the guilty verdict. We affirm.

---

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

## I

On January 29, 1983, Charles Merrill Mount, a United States citizen, was arrested by British police officers in the village of Henley, England, for failing to return a rental car on time. He was searched at the police station and, while he was still in police custody, the officers also searched his residence on two separate occasions.[1] As a result of the searches, the officers discovered five different United States passports, in the names respectively of Charles Merrill Mount, Charles David Kern, Thomas Kelly Clinard, Edward George Hearn, and Sidney C. Nussenbaum.[2] These passports and other evidence were eventually turned over to the American authorities, but United States officials did not become involved in appellant's problems with the British police until after the searches had been completed.[3]

Some nine months later, appellant was indicted by a grand jury in the U.S. District Court for the District of Columbia on four counts of making false statements. After a jury trial, he was acquitted of three of the charges (relating to the Clinard, Hearn, and Nussenbaum passport applications) and convicted of one (that relating to the application for the Kern passport). Judge William B. Bryant suspended the imposition of sentence and placed appellant on probation for a period of one year. This appeal followed.

## II

Appellant contends that the District Court erred in denying his motion to suppress the passports and other evidence[4] seized by the British police as a result of the searches of his residence in England

and subsequently furnished to United States prosecutorial authorities. It is his contention that use of this evidence in a trial in federal court violates the Fourth Amendment's exclusionary rule. We hold that this doctrine does not warrant suppression in these circumstances.

■ The principal purpose of the exclusionary rule is the deterrence of unlawful police conduct, the theory being that such deterrence tends to foster obedience to the mandate of Fourth Amendment. *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). In circumstances where application of the rule does not result in appreciable deterrence, its use is not warranted. *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Desist v. United States*, 394 U.S. 244, 254 n. 24, 89 S.Ct. 1030, 1036 n. 24, 22 L.Ed.2d 248 (1969); *United States v. Calandra, supra.*

■ It is obvious, and the decisions have therefore recognized, that since United States courts cannot be expected to police law enforcement practices around the world, let alone to conform such practices to Fourth Amendment standards by means of deterrence, the exclusionary rule does not normally apply to foreign searches conducted by foreign officials. See, *e.g., United States v. Janis, supra*, 428 U.S. at 455–56 n. 31, 96 S.Ct. at 3032–33 n. 31; *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Cotroni*, 527 F.2d 708, 711–12 (2d Cir.1975),

---

1. It is undisputed that the officers did not have a warrant for these searches. One of the searches involved the opening of a locked suitcase.

2. There is a dispute whether the Kern passport was seized from appellant's person or from his home and whether appellant consented to the searches of his home. The District Court found that appellant had not consented to the searches; it did not explicitly resolve the dispute regarding the location of the seizure.

3. The British police contacted these authorities (through a telegram to Interpol in London) the day after the first search. Actual contact with American officials was made the day after the second search. No search of appellant's person or premises was conducted thereafter.

4. In addition to the passports, the police seized various identification papers matching appellant's several passports.

*cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976); *United States v. Hawkins,* 661 F.2d 436, 455–56 (5th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *Stowe v. Devoy,* 588 F.2d 336, 341 (2d Cir.1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); *United States v. Morrow,* 537 F.2d 120, 139–40 (5th Cir.1976), *cert. denied sub nom. Martin v. United States,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Rose,* 570 F.2d 1358, 1361–62 (9th Cir.1978); *United States v. Callaway,* 446 F.2d 753, 755 (3rd Cir.), *cert. denied,* 404 U.S. 1021, 92 S.Ct. 694, 30 L.Ed.2d 670 (1972).

▄▄▄ The exclusionary rule does apply to a foreign search if American officials or officers participated in some significant way, for in such a situation the deterrence principle may be deemed to operate. See, *e.g., Stowe v. Devoy, supra; United States v. Morrow, supra; United States v. Rose, supra; Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). This exception to the usual foreign search rule does not provide any comfort to this appellant, however, for it is clear from the record that there was no United States participation whatever in either of the searches of his residence. As indicated above, note 3 *supra,* the American authorities did not even know about his first search until after the second search had

been effected. The motion to suppress was properly denied by the District Court.[5]

## III

▄▄▄ The second issue raised by the appeal is whether the evidence was sufficient to support the guilty verdict.[6] Under the terms of 18 U.S.C. § 1542, the government must prove that the defendant made a false statement with knowledge of its falsity and that he had the specific intent to secure the issuance of a passport. Where use of a false name is charged, the prosecution must show, first, that the name was not, in fact, the defendant's name, and second, that the defendant assumed the name for a fraudulent purpose. See *United States v. Cox,* 593 F.2d 46 (6th Cir.1979).

▄▄▄ Appellant argues that the name Charles David Kern was not a false name, his theory being that at common law an individual has a right to adopt any name that he chooses without necessarily proceeding by way of a petition to a court for a formal change of name, and that he had simply availed himself of that common law right. Appellant's legal premise is correct;[7] but that does not help him on the facts of this case.

▄▄▄ Briefly, it was appellant's contention at the trial that he used the Kern name (as well as the names of Clinard, Hearn, and Nussenbaum)[8] to escape from the harassment of an attorney working for

---

5. We reject as entirely without merit appellant's alternative argument that the evidence should be suppressed in the exercise of the courts' supervisory power over the administration of criminal justice. No court has ever endorsed reliance on that power in circumstances such as these where the actions of foreign law enforcement authorities could not be regarded as shocking the judicial conscience by any legitimate test. As for the broader questions of interpretation and policy which surround the issue of the present existence of the supervisory power, we believe that decision thereon should await a case in which they may be weighed in the context of the employment of foreign police actions which, unlike those in this case, are at least arguably shocking and where the court is able, in that context, to consider such factors as the precise nature of those actions and the probative value of the evidence.

6. The general standard for evaluating the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the government, a reasonable mind might fairly conclude beyond a reasonable doubt that the defendant is guilty. See *United States v. Davis,* 562 F.2d 681 (D.C.Cir.1977); *Crawford v. United States,* 375 F.2d 332 (D.C.Cir. 1967); *Curley v. United States,* 160 F.2d 229 (D.C.Cir.), cert. denied, 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947).

7. *United States v. Cox,* supra.

8. Appellant was born in 1928 as Sherman M. Suchow. He legally changed his name to Charles Merrill Mount in 1963. It has not been charged, nor could it have been, that he could not validly use the Mount name.

his mother or his wife's family [9] and to allow him to cope with well-publicized litigation concerning his work as an art historian.[10]

While recital of these purposes does not appear, on its face, to present a credible defense, it also cannot, without more, be dismissed out of hand. Accordingly, the District Court quite properly submitted appellant's theory of the case to the jury.[11] But it is obvious that the jury was not obliged to accept appellant's version—and we are not obliged to reverse—if that version was contradicted by credible evidence indicating a fraudulent purpose. There was ample evidence here of such a purpose.

**First.** Appellant not only had in his possession a valid passport in his own name (Mount), but over a five-year period he had applied for and secured passports in no less than four different other names.[12] That circumstance alone would seem to negate appellant's common law change of name theory, and it would likewise permit the trier of facts to infer a fraudulent purpose.

**Second.** Appellant's application for the Kern passport was supported by an Ohio birth certificate and a Virginia's driver license. Both of these documents were false. Here again, a fraudulent purpose springs easily to mind.

**Third.** Even more compelling evidence of such a purpose emerges from the facts surrounding appellant's acquisition of the Kern passport. Using his own name Charles Merrill Mount, appellant was convicted on March 8, 1982, on a plea of guilty in federal court in Virginia on a felony charge of making threatening telephone calls,[13] and he was ordered to return to court for sentencing on April 9, 1982. Seven days before the sentencing date, he applied for a passport in the Kern name [14]—a fact which suggests that he sought to secure that particular passport so that, in the event the court sentenced him to serve a term of imprisonment, he could use it to flee [15] prior to the commencement of any such service.[16] As it turned out, appellant

9. This harassment was said to be related to a custody battle involving appellant's four children. Appellant's mother and his wife's family are claimed to have participated in that battle which, according to appellant, included such events as the kidnapping of his children by his wife, and the refusal of a court in Ireland to permit him to be sworn while touching the Bible because he is not a Roman Catholic.

10. These purposes would allegedly all have been achieved by incognito travel in Europe.

11. The trial judge instructed the jury as follows:
As I have indicated to you, the defendant is charged with falsely stating his name in an application for a passport. And he denies the offense and asserts that he truthfully stated his name in the application.
He's indicated to you that at the time he applied for these passports that he had adopted these names for other purposes. And I instruct you that a person may assume or be known by different names. No law against that.
A person may adopt any name without resort to legal proceedings. You don't have to go to court. People do have their names changed by legal proceedings, but you don't have to, provided it is not done for any fraudulent purpose.
In deciding whether the defendant adopted the names he asserts non-fraudulently, that is,

without a fraudulent purpose, you should consider all the evidence and testimony, including the circumstances under which he adopted the name, the length of time under which he claims to have been known by this name, and whether he consistently used the name in the circumstances under which the name was adopted.
Transcript at 588.

12. The real Edward George Hearn and the real Sidney Z. Nussenbaum testified that they had not given permission to appellant for the use of their names. Thomas Kelley Clinard died in 1970, long before appellant decided to use his name. Charles David Kern did not testify at the trial.

13. Until his arrest on that charge, appellant had been living in Virginia under the name Edward G. Hearn.

14. Appellant stated that he was "uncertain" whether he had ever been known as Charles David Kern prior to that time.

15. Appellant did not inform the probation officer who was preparing his presentence report of his impending name change.

16. Particularly in the case of offenders without a prior record of violence or flight, it is not

was sentenced to a probationary term, and immediate use of the Kern passport accordingly became unnecessary. However, when in November 1982 probation revocation proceedings were initiated, appellant did use the Kern passport to travel to Great Britain.[17]

On these facts, the jury had ample justification for finding that appellant had adopted the Kern name for fraudulent purposes, and it was likewise justified, on that basis, in returning a guilty verdict on the false statement charge.

We find no error, and the judgment of conviction is accordingly

*Affirmed.*

BORK, Circuit Judge, concurring:

While I concur in the judgment of the court and in much of Judge Greene's excellent opinion, I write separately because it seems necessary to meet more directly appellant's arguments concerning the exclusionary rule. Appellant contends that there should be an exclusionary rule in cases where foreign law enforcement authorities secure evidence by means which "shock the judicial conscience." Opening Brief for Appellant at 23–28. He would have us derive this rule not from the Fourth Amendment but from our supervisory power over criminal proceedings. Yet, neither this court nor the Supreme Court has ever before required such a rule, and I can think of no useful purpose the proposed rule would serve. Indeed, I do not believe that we have the authority to refuse to consider evidence of this kind.

### I.

Appellant relies upon cases from other circuits that adopt the rule he urges upon us. Though it is clear that the Fourth Amendment prohibition of "unreasonable searches and seizures" has no application to illegal foreign searches conducted exclusively by foreign officials, *United States v. Janis,* 428 U.S. 433, 455–56 n. 31, 96 S.Ct. 3021, 3032–33 n. 31, 49 L.Ed.2d 1046 (1976), these circuits would derive an exclusionary rule for foreign searches from the supervisory power of the federal courts over the administration of criminal justice. *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943) (Frankfurter, J.). The initial difficulty with this approach—and I believe it to be a fatal one—is that our supervisory powers have been substantially curtailed by the Supreme Court's recent decision in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Under that decision, we clearly lack supervisory power to create any exclusionary rule that expands the rule the Supreme Court has created under the Fourth Amendment. That forecloses any exclusion of evidence seized abroad by foreign police.[1]

In *Payner,* special agents of the Internal Revenue Service arranged for a private investigator to conduct an unconstitutional search of the belongings of a bank vice president in the hope of obtaining incriminating evidence against third parties. As a result of this search, evidence was obtained that ultimately incriminated a third party, Jack Payner. The district court found that

unusual for judges to permit their voluntary surrender if sentenced to imprisonment in order to allow them to wind up their affairs.

**17.** On the day appellant was informed by his probation officer that a warrant had been issued for his arrest for violation of probation, he checked into a motel under the name of Hearn, and one week later he travelled to Great Britain by way of Canada and Spain under the name Charles David Kern. After entering Great Britain, appellant first used the name of Clinard; later he rented a car under the name Hearn; and he finally took up residence in England under the name of Lynn Proby.

**1.** I do not consider here the applicability of the Fourth Amendment exclusionary rule in cases where American officials or officers participated in the illegal search in some significant way. In some such cases, deterrence principles might still be deemed to operate, and the Fourth Amendment might also be triggered. In this case, "it is clear from the record that there was no United States participation whatever in either of the searches of [Mount's] residence." Maj. op. at 1318.

the IRS was deliberately conducting unconstitutional searches in order to find evidence against third-party suspects. The IRS was informing its agents that these suspects would lack standing under the Fourth Amendment to challenge the legality of the original unconstitutional searches. Because of the government's willful disobedience of the law, the district court employed its supervisory power to exclude the tainted evidence incriminating Payner even though the Fourth Amendment did not apply. The Sixth Circuit affirmed, 590 F.2d 206 (1979) (per curiam), and the Supreme Court reversed.

Justice Powell, writing for the Court, held that the supervisory power could not be used to exclude evidence in a criminal prosecution where the defendant would not have had standing to seek exclusion under the Fourth Amendment. To allow exclusion under the supervisory power, he said, would be to erode the Supreme Court's Fourth Amendment case law with its carefully drawn balance between individual and governmental rights. Justice Powell observed that

> [t]he values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment. In either case, the need to deter the underlying conduct and the detrimental impact of excluding the evidence remain precisely the same.

447 U.S. at 736, 100 S.Ct. at 2447. Accordingly, the Court grafted the standing limitations of the Fourth Amendment onto the supervisory power. The Court also stated that the purposes of the supervisory power and of the Fourth Amendment exclusionary rule are essentially alike. *Id.* at 735–36 n. 8, 100 S.Ct. at 2446–47 n. 8.

The *Payner* analysis suggests that appellant errs for two reasons. First, *Payner* demonstrates that we should not suppress evidence under our supervisory authority in a way that would disturb the balance struck by the Court's Fourth Amendment case law.[2] That case law, as noted above, refuses to apply an exclusionary rule to evidence secured by foreign law enforcement authorities. This follows from the Court's holding that where the exclusionary rule "does not result in appreciable deterrence, its use is not warranted." *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 3414, 82 L.Ed.2d 677 (1984). The exclusion of evidence by American courts because the evidence was deemed obtained in objectionable ways would in no way deter conduct by foreign police acting in their own countries for their own reasons. In such cases, exclusion under the supervisory power would be improper since it would seriously alter the balance the Court has already struck between the "need to deter ... underlying [mis]conduct and the detrimental impact of excluding ... evidence." *Payner,* 447 U.S. at 736, 100 S.Ct. at 2447.

In addition, *Payner* changes the emphasis in earlier cases concerning the legitimate reasons for excluding evidence under the supervisory power. Whereas *McNabb* emphasized only the need to protect the integrity of the court, *Payner* suggests that exclusion under the supervisory power and the Fourth Amendment serve "precisely the same purposes." 447 U.S. at 736 n. 8, 100 S.Ct. at 2447 n. 8. In *Payner* those purposes were identified as involving both the deterrence of illegality and the protection of judicial integrity. As we have seen, however, deterrence is now essential before exclusion can ever be appropriate under the Fourth Amendment. *United States v. Leon,* 104 S.Ct. at 3414. Pursuant to *Payner,* some degree of deterrence also appears to be essential before exclusion can ever be justified under the supervisory power as well. *Accord United States v. Hasting,* 461 U.S. 499, 505, 103

---

**2.** This court has twice suggested that under *Payner* we should not use our supervisory power unless a defendant's specific constitutional rights have been violated. *United States v. Byers,* 740 F.2d 1104, 1122–23 (D.C.Cir.1984) (en banc) (Scalia, J.); *United States v. Kelly,* —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). There is no allegation of such a violation in the present case.

S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) (supervisory power exists in part to deter official misconduct).

By grafting Fourth Amendment standing requirements onto the supervisory power, *Payner* substantially de-emphasized the notion that that power is exercised only to protect the integrity of the court. Individual standing requirements make no sense where the injury complained of is exclusively to the *court's* integrity and reputation. As Justice Marshall noted in dissent, *Payner's* standing requirement for invoking the supervisory power implies "that the only value served by suppression [under that power] is deterrence of future misconduct." *Payner*, 447 U.S. at 745–46 n. 10, 100 S.Ct. at 2451–52 n. 10 (Marshall, J., dissenting).

This case is thus even easier than *Payner* since the IRS officials who were conducting illegal searches in that case could presumably have been deterred if the Supreme Court had been willing to exclude the evidence they had seized. As I have noted, no such deterrence is ever possible with foreign searches: Evidentiary rules in this country cannot be expected to influence the investigative practices of foreign police.[3]

Appellant notes correctly that several other circuits have previously stated that we should use our supervisory power to suppress evidence of a foreign search secured by means which "shock the judicial conscience." *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Maher*, 645 F.2d 780, 783 (9th Cir.1981); *Stowe v. Devoy*, 588 F.2d 336, 341 (2d Cir.1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir.1978); *United States v.*

*Morrow*, 537 F.2d 120, 139 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Cotroni*, 527 F.2d 708, 712 n. 10 (2d Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976); *Birdsell v. United States*, 346 F.2d 775, 782 n. 10 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965). Almost all of these decisions, however, predate the Supreme Court's decision in *Payner*, and none of them discusses *Payner* or the limits which it imposes on the supervisory power of the federal courts. Moreover, none of these cases actually reversed a conviction under the shock-the-conscience rationale. The statements endorsing that rationale are dicta which we must reject in light of *Payner*.

Supervisory authority to exclude such evidence must also be questioned because of another development which the case law in other circuits appears not to have considered. Since *McNabb* was decided, the Federal Rules of Evidence have been codified and approved by Congress. One of those rules directs that the courts should admit relevant evidence "except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court *pursuant to statutory authority.*" Fed.R.Evid. 402 (emphasis added). No exception is made allowing courts to exclude relevant evidence solely pursuant to a supervisory power. *See id.* Notes of Committee on the Judiciary, House Report No. 93–650. Consequently, there is doubt as to our continued authority ever to reject any relevant evidence under that power. *Payner* and the other recent supervisory power cases do not address this question and consequently they do not establish the continued vitality of the su-

3. *Payner* also suggests that we could not employ our supervisory authority in cases involving foreign searches because in prosecutions resulting from such searches the foreign government will not be among the parties before the bar. Under *Payner*, our supervisory power is strictly limited to supervision of "'the administration of criminal justice' *among the parties before the bar*." 447 U.S. at 735 n. 7, 100 S.Ct. at 2446 n. 7

(emphasis added; citation omitted). Here the British government is not a party, and accordingly we would be precluded from using our supervisory power even if our consciences had been shocked. It should also be noted that the British police officers who conducted the searches in this case testified that they believed those searches were legal under British law. Brief for Appellee at 21.

pervisory power in the face of Congress' actions.[4] *But see Payner*, 447 U.S. at 751 n. 17, 100 S.Ct. at 2454 n. 17 (Marshall, J., dissenting). It seems likely to me, however, that the courts are no longer as free to rewrite the Federal Rules of Evidence as they were when *McNabb* was decided. At that time the courts had exclusive responsibility for the devising of evidentiary rules.[5] *See also United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) (Rehnquist, J.) (supervisory power does not confer on "the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve").

## II.

Even if we had the power sometimes to exclude evidence obtained through illegal foreign searches, I would still disagree with the case law adopting a shock-the-conscience test to determine what evidence is to be excluded.[6] Such tests are wholly indeterminate and vague, and can lead to unprincipled, ad hoc decision-making. *Rochin v. California*, 342 U.S. 165, 174–77, 72 S.Ct. 205, 210–12, 96 L.Ed. 183 (1952) (Black, J., concurring). There is no need to

extend such a test from the due process context, where it is already required, *Rochin v. California*, 342 U.S. at 172–73, 72 S.Ct. at 209–10 (Frankfurter, J.), to this context, where it is not. The inability of the other circuits to state a more precise rule of law for excluding evidence obtained in foreign searches suggests to me that they have embarked on a very dubious enterprise.

It is not, at all events, easy to see what the shock-the-conscience test adds, or should be allowed to add, to the deterrent function of exclusionary rules. Where no deterrence of unconstitutional police behavior is possible, a decision to exclude probative evidence with the result that a criminal goes free to prey upon the public should shock the judicial conscience even more than admitting the evidence. The "integrity of the court" should not be preserved at the expense of the public. *See also United States v. Leon*, 104 S.Ct. at 3413; *Stone v. Powell*, 428 U.S. 465, 491, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976). Reflections such as these, perhaps, have led the Supreme Court to conclude that "appreciable deterrence" is the *sine qua non* for the

---

**4.** *See also* Judge Scalia's opinion for the en banc court in *United States v. Byers*, 740 F.2d at 1122, observing that "[t]he Supreme Court's last holding sanctioning the use of the supervisory power to exclude evidence is now almost twenty-five years old [and] [t]hat case involved evidence acquired by the government through unconstitutional means."

**5.** I do not mean to imply, of course, that Congress could impose evidentiary rules on the courts that violated the constitutional rights of litigants or that impaired our ability to carry out our responsibilities as a separate branch of government under Article III.

**6.** The majority cites this case law approvingly and goes on to suggest that it will "not normally" exclude evidence obtained through illegal foreign searches. Maj. op. at 1318. However, the Supreme Court has announced a flat rule against such exclusion, not that exclusion is not normally proper. Moreover, the majority explicitly reserves decision on the continued vitality of the supervisory power and the shock-the-conscience test notwithstanding the clear implications of *Payner*, Maj. op. at 1318 n. 5. These comments will undoubtedly encourage the con-

tinued making and consideration of suppression motions based on the shock-the-conscience formulation. The majority appears to be reserving the option of creating an exception to *Payner* if it finds some future case sufficiently disturbing.

The majority's refusal to apply clear Supreme Court precedent today creates doubt as to this court's willingness to follow that precedent in the future. That doubt in turn will generate costly litigation over matters that should not be open to dispute. A clear rule of law, grounded in Supreme Court precedent, would save future litigants much time and money.

The majority prefers not to announce such a rule because in its view this case does not present the problem of a shockingly illegal foreign search. That, however, is entirely beside the point. The *per se* rule of non-exclusion is clearly required by *Payner* and will not be affected by the facts of future cases. The legal issue at stake here is one of pure law, goes to the authority of this court, and is susceptible to a *per se* approach. It is thus appropriate for us to resolve appellant's claim by a rule of law. The legal issue has been properly raised and will not be affected by the subjective impressions of future panels as to what illegal foreign searches are shocking.

exclusion of illegally seized but probative evidence. *United States v. Leon,* 104 S.Ct. at 3414; *United States v. Janis,* 428 U.S. at 454, 96 S.Ct. at 3032. It appears, therefore, that the shock-the-conscience formulation has been deprived of analytical power and is, in this area, little more than a rhetorical flourish in decisions arrived at upon other grounds. We would do well to make that fact explicit and so discourage the making and consideration of fruitless motions to suppress evidence.[7]

---

**7.** Given the facts of this case, I need not address the possible due process or self-incrimination problems that might bar the admission of inherently unreliable evidence obtained by foreign police through beatings, torture, coercive interrogations or other forms of physical abuse. *See, e.g., Rochin v. California,* 342 U.S. at 172–73, 72 S.Ct. at 209–10. Obviously, courts should continue to exclude evidence if it is inherently unreliable or if it is irrelevant to the crime charged. I do not agree, however, that these decisions to exclude can *ever* be made through an *ad hoc* exercise of the "supervisory power." *Compare* maj. op. at 1318 n. 5. Under *Payner,* it will be necessary instead that we exclude evidence only when specific constitutional or legal provisions call for that remedy.