11-1237-cr
United States of America v. Getto

# In the

# United States Court of Appeals

## For the Second Circuit

————

No. 11-1237-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

MATTHEW GETTO,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 09 CR 667 (HB) — Harold Baer, Jr., *Judge.*

————

ARGUED: OCTOBER 24, 2012
DECIDED: SEPTEMBER 9, 2013

————

Before: CABRANES, SACK and CARNEY, *Circuit Judges.*

————

In this appeal we consider two issues: (1) whether the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*) erred in denying the motion of defendant-appellant Matthew Getto, an American citizen, to suppress evidence obtained through searches and surveillance undertaken in Israel by the Israeli National Police following a request by American law enforcement pursuant to a mutual legal assistance treaty; and (2) whether the District Court committed procedural error in calculating Getto's sentence.

We hold that ongoing collaboration between an American law enforcement agency and its foreign counterpart in the course of parallel investigations does not—without American control, direction, or an intent to evade the Constitution—give rise to a relationship between the two entities sufficient to apply the exclusionary rule to evidence obtained abroad by foreign law enforcement. We also hold that, in the circumstances presented, the alleged warrantless searches and surveillance do not shock the judicial conscience. As a result, the District Court correctly denied Getto's motion to suppress the evidence gathered through foreign searches and surveillance.

We further conclude that the District Court committed procedural error by failing to explain adequately the sentence it imposed. Accordingly, we **AFFIRM** the judgment of conviction in all respects, except for the sentence; and **REMAND** the cause to the District Court with instructions to vacate Getto's

sentence and resentence him in a manner consistent with this opinion.

_____

STEPHANIE M. CARVLIN, Law Office of Stephanie M. Carvlin, New York, NY, *for Matthew Getto*.

STEVE C. LEE (Avi Weitzman, Justin S. Weddle, Assistant United States Attorneys, *on the brief*), Assistant United States Attorney, *for* Preet Bharara, United States Attorney for the Southern District of New York, *for the United States of America*.

_____

JOSÉ A. CABRANES, *Circuit Judge*:

Getto, an American citizen, appeals from a March 29, 2011 judgment of conviction entered by the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*), sentencing Getto to 150 months' imprisonment and imposing restitution in the amount of $8,200,000. We consider: (1) whether the District Court erred in denying defendant Matthew Getto's motion to suppress evidence obtained through searches and surveillance undertaken in Israel by the Israeli National Police ("INP"), following a Mutual Legal Assistance Treaty ("MLAT") request by American law enforcement; and (2) whether the District Court

committed procedural error in calculating Getto's sentence.

We hold that ongoing collaboration between an American law enforcement agency and its foreign counterpart in the course of parallel investigations does not—without American control, direction, or an intent to evade the Constitution—give rise to a relationship sufficient to apply the exclusionary rule to evidence obtained abroad by foreign law enforcement. Consequently, the District Court correctly denied Getto's motion to suppress the evidence gathered through foreign searches and surveillance. We further conclude that the District Court committed procedural error in failing adequately to explain the sentence it imposed. Accordingly, we affirm Getto's conviction, but remand the cause to the District Court with instructions to vacate Getto's sentence and resentence him in a manner consistent with this opinion.

## I. BACKGROUND

Following an October 18, 2010 bench trial on stipulated facts, Getto was convicted of a single count of conspiracy to commit mail fraud and wire fraud through telemarketing, in violation of 18 U.S.C. §§ 1349, 2326(2). Getto's conviction stemmed from his involvement in a conspiracy that had defrauded American victims through a lottery telemarketing scheme operated out of three so-called "boiler rooms" at different locations in Israel. A member of the conspiracy would purchase batches of lottery tickets containing the

contact information of lottery entrants, which lotteries and sweepstakes typically sell to legitimate businesses for marketing purposes. The conspirators, billing themselves as lawyers or other staff working for a fictional lottery, then called unsuspecting lottery entrants and told them that they had won substantial cash prizes in an international sweepstakes. Under this guise, the conspirators would gather further information about the lottery entrants—such as their age and finances—to target, in particular, wealthy, elderly victims. At the last step, they would tell their targets that certain "taxes and fees" needed to be paid at the outset. The unwitting victims would then be asked to send the sums to the conspirators in the hopes of obtaining the phantom cash prize.

The workers in the three boiler rooms were organized into groups, based on function, with corresponding levels of compensation. "Qualifiers" would call the victims in the first instance to obtain personal and financial information.[1] If the victims met certain criteria, their information was then passed along to "Shooters." Shooters had the more delicate task of informing the victims that they had won a prize and of persuading them to send money. To do this, Shooters would often pose as employees of a fake law firm or as officials from the Internal Revenue Service, even going so far as faxing their targets fraudulent documents as

---

[1] Qualifiers were paid 5% of the gross proceeds obtained from their victims and a daily salary equivalent to $50.

part of the ruse.[2] Shooters would also often repeatedly bilk the same victims, claiming, for instance, that the prize had doubled and additional fees needed to be paid.[3] The operations at each boiler room were ultimately overseen by "Managers," who kept records, distributed proceeds, and assisted in swindling the victims.

Getto joined the conspiracy in October 2007, as a Shooter in a boiler room on Ha'Arad Street in Tel Aviv, Israel ("Ha'Arad room"). At the time, there was only one other boiler room, which was located in Eilat, Israel ("Eilat room"). In March 2009, Getto leased an additional boiler room, located on Ha'Negev Street in Tel Aviv ("Ha'Negev room"). He served as both a Manager and a Shooter in the Ha'Negev room; he also had an ownership stake in the Ha'Negev room, which entitled him to a greater share of its profits.

Sometime in late 2008, based on a tip from a witness in the United States, the Federal Bureau of Investigation ("FBI") initiated an investigation into the conspiracy. Operating undercover, FBI agents planted "dummy" lottery tickets containing their own contact information in shipments bound for an identified conspirator, and posed as victims when subsequently contacted by members of the conspiracy in early 2009.

---

[2] Shooters were paid a commission ranging from 20-25% of the gross proceeds obtained from their victims.

[3] In this manner, some elderly victims ultimately lost hundreds of thousands of dollars to defendant and his confederates.

This tactic allowed the agents to trace the telephone numbers and bank accounts used by the conspirators.

On April 20, 2009, American law enforcement authorities filed a request, pursuant to the MLAT between the United States and Israel[4] for the Israeli National Police to investigate the conspiracy. As part of the MLAT request, the FBI provided the INP with the details of the investigation in the United States, including Israeli phone numbers belonging to suspected conspirators. Using this information, the INP conducted an investigation that began by identifying a "SIM"[5] card associated with one of the suspects' phone numbers, and by interviewing employees at Tel Aviv restaurants called on the number (who directed the INP to the address of the Ha'Negev boiler room) and the superintendent of the building where the Ha'Negev room was located. The INP then sought, and received, Israeli court authorization to install a clandestine surveillance device in the Ha'Negev room and to search it. Based in part on the evidence gathered from the Ha'Negev room, Getto was arrested in the United States in July 2009.

---

[4] The Treaty with Israel on Mutual Legal Assistance in Criminal Matters entered into force on May 25, 1999. *See* Treaty with Israel on Mutual Legal Assistance in Criminal Matters, U.S.-Isr., Jan. 26, 1998, S. Treaty Doc. No. 105-40, 1998 WL 1784226. The Treaty provides that the United States and Israel "shall provide mutual assistance . . . in connection with the investigation, prosecution, and prevention of offenses, and in proceedings related to criminal matters." *Id.* at *8.

[5] "A SIM, or 'security identity module,' card is the device within a phone that contains the unique information identifying a particular subscriber." *United States v. Moreno*, 701 F.3d 64, 71 n.9 (2d Cir. 2012) (internal quotation marks omitted).

Before the District Court, Getto moved to suppress the evidence gathered by the INP as inadmissible. He claimed that, although evidence obtained abroad by foreign law officials is not ordinarily subject to suppression, he was entitled to exclusion of the evidence because (1) the INP was working jointly with the FBI, and (2) "the actions of the INP in obtaining the evidence were sufficient[ly] egregious to trigger application of the Fourth Amendment." Appellant's Br. 9. On August 25, 2010, the District Court denied the defendant's motion to suppress without an evidentiary hearing. *United States v. Getto*, No. 09 CR 667(HB), 2010 WL 3467860 (S.D.N.Y. Aug. 25, 2010). Following a bench trial on stipulated facts, the District Court found Getto guilty on October 28, 2010. *United States v. Getto*, No. 09 CR 667(HB), 2010 WL 4449514 (S.D.N.Y. Oct. 28, 2010). On March 25, 2011, the District Court sentenced Getto to a term of 150 months' imprisonment, followed by three years' supervised release, and restitution in the amount of $8,200,000, a sum based on the loss amount and the number of victims swindled by workers in all three boiler rooms.

This timely appeal followed.

## II. DISCUSSION

Getto asserts two claims on appeal: (1) the District Court should have granted his motion to suppress the

foreign evidence[6]; and (2) the District Court committed procedural error by sentencing him, without sufficient explanation, based on the offense conduct of conspirators in all three boiler rooms. We consider each claim in turn.

## A. Suppression of Foreign Evidence

Our "standard of review for evaluating the district court's ruling on a suppression motion is clear error as to the district court's factual findings, viewing the evidence in the light most favorable to the government, and *de novo* as to questions of law." *United States v. Voustianiouk*, 685 F.3d 206, 210 (2d Cir. 2012).

We recently had occasion to review the scope of the Fourth Amendment's exclusionary rule with respect to foreign police actions and held that "suppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials."[7] *United*

---

[6] Getto also argues that the District Court should at least have held an evidentiary hearing prior to ruling on his motion to suppress. We review a denial of an evidentiary hearing for an abuse of discretion, *United States v. Bonventre*, 720 F.3d 126, 128 (2d Cir. 2013), and "an evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question," *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 165 (2d Cir. 2008). Because we hold that Getto's allegations, even if assumed to be true, would not require suppression, we also conclude that the District Court did not abuse its discretion in declining to hold an evidentiary hearing.

[7] We also noted the longstanding history and purpose of the rule, observing that

[m]ore than two decades ago, we held that "[w]hen conducted in this country, wiretaps by federal officials are largely governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. §§ 2510-2520," but that this statute "does not apply outside the United States." [*United States v. *]*Maturo*, 982 F.2d [57,] 60 [(2d Cir. 1992)]. It is also well-established that the Fourth Amendment's exclusionary rule, which requires that evidence seized in violation of the Fourth Amendment must be suppressed, generally does not apply to evidence obtained by searches abroad conducted by foreign officials. *See United States v. Janis*, 428 U.S. 433, 455 n.31 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."). We held as long ago as 1975 that "information furnished [to] American officials by foreign police need not be excluded simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975). This is so even when "the persons arrested and from whom the evidence is seized are American citizens." *Stowe v. Devoy*, 588 F.2d 336, 341 (2d Cir. 1978). Significantly, in this context, the Fourth Amendment's exclusionary rule does not serve the deterrence purpose for which it was designed because "the actions of an American court are unlikely to influence the conduct of foreign police." *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012) (quotation marks omitted); *see also Cotroni*, 527 F.2d at 712 ("The exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation. Since it has little if any deterrent effect upon foreign police, it is seldom used to bar their work product." (internal citations omitted)); *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995) ("Neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." (quotation marks and alteration omitted)); *United States v. Mount*, 757 F.2d 1315, 1317-18

*States v. Lee*, --- F.3d ----, 2013 WL 2450533, at *4 (2d Cir. June 7, 2013); *see also United States v. Busic*, 592 F.2d 13, 23 (2d Cir. 1978) ("[T]he Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country."). In reaffirming the general rule against suppressing evidence collected by foreign law enforcement authorities abroad—a rule occasionally referred to as the "international silver platter doctrine," *see Lee*, 2013 WL 2450533, at *3 n.3 (noting "the substantive viability of the international silver platter doctrine, if not the clarity of its moniker")—we also noted our recognition of "two circumstances where evidence obtained in a foreign jurisdiction may be excluded[:] [f]irst, where the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience and second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions." *Id*. at *4 (internal quotations marks and alterations omitted). On appeal, Getto concedes the continuing vitality of the general rule, but claims that the facts of the instant case require suppression of the fruits of the search on the basis of *both* exceptions set forth above. Appellant's Br. 43.

We first consider Getto's claim that the INP's conduct shocks the judicial conscience, and then turn to

---

(D.C. Cir. 1985) ("[T]he exclusionary rule does not normally apply to foreign searches conducted by foreign officials.").

*United States v. Lee*, --- F.3d ----, 2013 WL 2450533, at *3 (2d Cir. June 7, 2013).

the issue of whether the INP's parallel investigation, conducted to assist in the American investigation, demonstrates "cooperation" sufficient to trigger the Fourth Amendment's exclusionary rule. Third, we also consider the applicability of the so-called "joint venture" doctrine to cases where a defendant seeks to suppress evidence on the basis of alleged Fourth Amendment violations abroad. We observe, by way of preface, that even if the Fourth Amendment's exclusionary rule were to apply here, the evidence need not be suppressed unless the foreign search was unreasonable. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 167 (2d Cir. 2008) ("[T]he Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness.").

### i. "Shocks the Conscience"

Defendant argues that the INP's conduct meets the threshold for "shock[ing] the judicial conscience." *Lee*, 2013 WL 2450533, at *4. Specifically, he claims that the INP searched the Ha'Negev room *before* it had obtained a warrant and that the INP concealed this fact by later lying in its warrant application. Appellant's Br. 41. In support of this contention, defendant proffered before the District Court that he had noticed "suspicious activity consistent with a break in," including that a security camera at the Ha'Negev boiler room had been turned off, items in the room had been rearranged, and a door handle had been broken. *Id*.

Getto also disputes the INP's account of its investigation, *see* Part I, *ante*, claiming that workers at the boiler room did not use telephones with "SIM" cards, *see* note 5 and accompanying text, *ante*, and, in any event, did not use their telephones for delivery service from Tel Aviv restaurants. Appellant's Br. 50.

Even accepting, *arguendo*, the credibility of Getto's contested allegations—which the District Court characterized as "speculative," *Getto*, 2010 WL 3467860, at *3—we find them insufficient to meet the high standard necessary to "shock the judicial conscience" recognized by our court and by others in transnational law enforcement cases. In the due process context, we have explained that conduct does not shock the judicial conscience when it is "simply illegal"; rather, it must be "egregious." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 (2d Cir. 1975); *cf. United States v. Alvarez-Machain*, 504 U.S. 655, 661 (1992) (applying the "*Ker-Frisbie*" doctrine—"'that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction'"—to an abduction abroad of a foreign citizen that was authorized by U.S. officials (quoting *Frisbie v. Collins*, 342 U.S. 519, 522 (1952))).[8] We

---

[8] Interpreting the decision in *Ker v. People of State of Illinois*, 119 U.S. 436 (1886), and related authority, the first Justice John Marshall Harlan long ago observed that, almost without exception, "there is nothing in the Constitution, treaties, or laws of the United States which exempts an offender, brought before the courts of a state for an offense against its laws, from trial and punishment, even though brought from another state by unlawful violence, or by abuse of legal process." *Pettibone v. Nichols*, 203 U.S. 192, 213 (1906) (internal quotation marks omitted).

have accordingly held that conduct did not shock the judicial conscience when, for example, there was no act "of torture, terror, or custodial interrogation of any kind," *Gengler*, 510 F.2d at 66, or when there was "no claim of 'rubbing pepper in the eyes,' or other shocking conduct," *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970). *See also United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009) ("The shocks the judicial conscience standard is meant to protect against conduct that violates fundamental international norms of decency." (internal quotation marks omitted)); *United States v. Mitro*, 880 F.2d 1480, 1483-84 (1st Cir. 1989) (same).

The requirement of a showing that conduct "shocks the conscience" stems not from the Fourth Amendment, but instead from a federal court's authority to exercise its supervisory powers over the administration of federal justice. *See United States v. Maturo*, 982 F.2d 57, 60-61 (2d Cir. 1992). Pursuant to this authority, "we may employ our supervisory powers when absolutely necessary to preserve the integrity of the criminal justice system." *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995); *cf. Emmanuel*, 565 F.3d at 1330.

Defendant's allegations, at most, amount to a claim that Israeli law enforcement officials may not have obtained a warrant under Israeli law prior to conducting some searches or surveillance—a circumstance that would hardly "violate[ ] fundamental international norms of decency." *Mitro*, 880 F.2d at 1484;

*see also id*. at 1483 n.2 (rejecting argument that "evidence derived from a foreign search is not admissible in an American prosecution if the foreign search violated foreign law"); *cf. In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 167 (holding that searches of U.S. citizens conducted abroad by U.S. agents are not governed by the Fourth Amendment's warrant requirement and need only be reasonable). As one of our sister circuits has said, "the wiretaps at issue cannot be said to shock the conscience" even when "secured in violation of [a] foreign law." *Barona*, 56 F.3d at 1091.

Defendant's argument on appeal that "[n]o case of this Court establishes that only physical abuse can constitute the kind of shocking conduct that could lead to suppression," Appellant's Br. 47-48, misses the basic nature of the standard. In the context of assessing abusive executive action, the concept of "shocking the conscience" derives from the Supreme Court's decision in *Rochin v. California*, 342 U.S. 165 (1952). *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In *Rochin*, the Supreme Court held that

> we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to

> open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

342 U.S. at 172. Indeed, the Supreme Court has explained that a "court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised [only in cases of] manifestly improper conduct by federal officials." *Lopez v. United States*, 373 U.S. 427, 440 (1963). The alleged searches and surveillance in the instant case are different in kind.

Accordingly, we conclude that the District Court did not err in denying defendant's motion to suppress on the basis that the search did not "shock the conscience."

### ii. "Implicates Constitutional Restrictions"

Defendant also argues that the instant case falls within the second exception to the "international silver platter doctrine," claiming that this case is one in which "cooperation with foreign law enforcement officials may implicate constitutional restrictions." *Lee*, 2013 WL 2450533, at *4 (internal quotation marks omitted). Defendant asserts that a number of factors bring this case within the so-called "constitutional restrictions"

exception, including: (1) the INP initiated its investigation based on the MLAT request from American law enforcement officials; (2) Israel never sought to prosecute Getto; (3) many other members of the conspiracy, or related conspiracies, were extradited to the United States; and (4) an article in an Israeli newspaper stated that American law enforcement agents watched live surveillance of the Ha'Negev boiler room.

We have explained that, under the "constitutional restrictions" exception, "constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Lee*, 2013 WL 2450533, at *4 (internal quotation marks omitted). In examining defendant's claims that both "virtual agency" and an intentional evasion of constitutional requirements occurred here, the District Court found that "[w]hile there was some cooperation in the case," it was not enough to fall within the exception. *Getto*, 2010 WL 3467860, at *3. We agree.

Addressing the two situations in turn, Getto first argues that the factors described above rendered the INP "virtual agents" of American law enforcement. In order to render foreign law enforcement officials virtual agents of the United States, American officials must

play some role in controlling or directing the conduct of the foreign parallel investigation. *See Lee*, 2013 WL 2450533, at *4 (noting that a foreign law enforcement agency did not "solicit the views, much less approval, of [American] agents prior to conducting surveillance"); *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975) (declining to suppress the fruits of foreign wiretaps where the "United States government did not in any way initiate, supervise, control or direct the wiretapping" (internal quotation marks omitted)). It is not enough that the foreign government undertook its investigation pursuant to an American MLAT request. Courts have repeatedly observed that the purpose of the exclusionary rule for Fourth Amendment violations is "to inculcate a respect for the Constitution in the police of *our own nation*," *Lee*, 2013 WL 2450533, at *3 (internal quotation marks omitted) (emphasis supplied); *see* note 7, *ante* (collecting authorities), and have "seldom used [it] to bar [foreign police] work product" because it "has little if any deterrent effect upon foreign police." *Lee*, 2013 WL 2450533, at *3 (internal quotation marks omitted). An inescapable corollary of this principle is that in instances where American law enforcement agents do not have authority to control or direct an investigation abroad, application of the exclusionary rule to the fruits of that investigation would serve no deterrence purpose. *See United States v. Janis*, 428 U.S. 433, 446 (1976) ("[T]he prime purpose of the rule, if not the sole one, is to deter future unlawful police conduct." (internal quotation marks omitted)); *see also Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) ("[B]ecause the rule is prudential rather than

constitutionally mandated, we have held it to be
applicable only where its deterrence benefits outweigh
its substantial social costs." (internal quotation marks
omitted)). As we explained in *United States v. Lira*, 515
F.2d 68 (2d Cir. 1975), "where the United States
Government plays no direct or substantial role in the
misconduct and the foreign police have acted not as
United States agents but merely on behalf of their own
government, the imposition of a penalty would only
deter United States representatives from making a
lawful request for the defendant and would not deter
any illegal conduct." *Id.* at 71.

A review of the record here makes clear that U.S.
officials neither controlled nor directed the foreign
investigation. Although American law enforcement
agents requested assistance with investigating Getto
and shared the results of their preliminary investigation
(*e.g.*, telephone numbers and bank account information)
with the INP, the foreign law enforcement agency
conducted an independent, parallel investigation.
Indeed, the American government has proffered, and
Getto has not rebutted, that, although American agents
"were in contact frequently [with their Israeli
counterparts] to share information," they did not
participate in *any* law enforcement actions by the INP in
Israel.[9] Joint App'x 195-96.

---

[9] For example, American agents were not involved in the
preparation, submission, and execution of search warrants. Nor were
they involved in the interviews of witnesses or defendants in Israel.

Defendant's allegations, even if credited, demonstrate only robust information-sharing and cooperation across parallel investigations and do not contradict the government's claim that the Israeli investigation was not controlled or directed by American law enforcement. *Cf. United States v. Paternina–Vergara*, 749 F.2d 993, 998 (2d Cir. 1984) (noting, in the context of statutory analysis of the Jencks Act, that "[t]he investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States"). We do not find persuasive defendant's argument that a "live feed" allowing American law enforcement agents to view surveillance footage in real time, supposedly referenced in an Israeli newspaper article, demonstrates that the INP acted as virtual agents of the United States. We have long allowed foreign authorities to share the fruits of an investigation with their American counterparts without suggesting or assuming that the latter controlled the investigation. *See, e.g.*, *Maturo*, 982 F.2d at 61. The ability of modern law enforcement agencies, aided by global telecommunications, to share information across borders without delay is not a significant departure from the traditional method of sharing surveillance after-the-fact and does not, in and of itself, give rise to an inference of agency. *See United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976) ("Normal lines of communication between the law enforcement agencies

of different countries are beneficial without question and are to be encouraged.").

Likewise, defendant's argument that the INP would not have investigated defendant but for the MLAT request, even if true, does not bear upon whether American law enforcement directed the subsequent investigation in Israel. Rather, this fact only shows that the INP was unaware of a criminal conspiracy within its jurisdiction whose victims were almost exclusively residing in the United States. *See Maturo*, 982 F.2d at 61 ("[T]he fact that the [Turkish National Police] did not initiate the wiretap until [American agents] gave them the numbers demonstrates only that the [Turkish National Police] was unaware that these individuals were using their phones to traffick [sic] narcotics."); *Morrow*, 537 F.2d at 140 ("Criminal conspiracies . . . are sometimes international in scope, and the routine transmittal of the name and telephone number of a possibly valuable informant [or suspect] across national borders clearly is permissible under the [F]ourth [A]mendment.").

Finally, we do not find particularly significant the fact that the defendant—an American citizen, whose victims were primarily American citizens—was arrested and charged in the United States, rather than charged in Israel. A number of factors may properly inform the decision of prosecutorial venue among different sovereign states, including: (1) the location of the relevant witnesses, victims, and evidence; (2) the nature of different legal systems; (3) the relative priority of a

case to different nations; and (4) the resources available to undertake the prosecution in different jurisdictions. *Cf. Linde v. Arab Bank, PLC*, 706 F.3d 92, 114 (2d Cir. 2013) (noting that different interests and legal codes might inform the decisions of foreign states in deciding whether to prosecute for similar offense conduct); *Slater v. Clarke*, 700 F.3d 1200, 1203 (9th Cir. 2012) (noting that "the decision whether to prosecute[ ] involves a balancing of myriad factors, including culpability, prosecutorial resources and public interests" (internal quotation marks and brackets omitted)). We decline to infer that the decision to prosecute defendant in the United States, without more, indicates that American law enforcement directed the preceding investigation abroad.

Second, Getto argues, *see* Appellant's Br. 43-47, that "the cooperation between the United States and foreign law enforcement agencies [was] designed to evade constitutional requirements applicable to American officials," *Lee*, 2013 WL 2450533, at \*4. By its terms, however, this method of fulfilling the "constitutional restrictions" exception requires some intent to evade American constitutional requirements. *See id.*; *cf. United States v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2003) (noting, in the context of overseas interrogations, that statements may be suppressed under the Fifth Amendment "where United States officials, although asking no questions directly, use foreign officials as their interrogation agents *in order to circumvent* the requirements of *Miranda*" (emphasis supplied)).

Getto points to nothing in the record suggesting an *intent* to evade the Fourth Amendment's requirements. Instead, the record demonstrates that the decision to request INP assistance was motivated by the inability of American law enforcement agents to further investigate criminal activity occurring substantially within the territory of a foreign sovereign. *See Maturo*, 982 F.2d at 62 ("[T]he [Turkish National Police's] wiretapping of phones in Turkey was prompted not by a desire to circumvent [American] constitutional constraints, but by [a] logistical problem."). Accordingly, we hold that the information in the record—the MLAT request, the information-sharing between American law enforcement and the INP, and American receipt of the fruits of the INP's investigation in Israel—reveals no cooperation "designed to evade constitutional requirements," *Maturo*, 982 F.2d at 61, but only successful coordinated law enforcement activity.

### iii. "Joint Venture" Doctrine

In analyzing Getto's claims within the constitutional restrictions exception, the District Court applied the "joint venture" doctrine adopted by some of our sister circuits. *Getto*, 2010 WL 3467860, at *3; *see generally United States v. Valdivia*, 680 F.3d 33, 52 (1st Cir. 2012); *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (holding that the exclusionary rule analysis applies if "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials"). We note that in the context of the Fourth Amendment,

the joint venture doctrine has been applied by other courts with inconsistent, even confusing, results. *Compare United States v. Behety*, 32 F.3d 503, 511 (11th Cir. 1994) (finding no joint venture where American agents provided information for a search, were present at the search, and videotaped part of it), *with Peterson*, 812 F.2d at 490 (finding joint venture where American officials described their actions as a "joint investigation" and were "involved daily in translating and decoding intercepted transmissions, as well as advising [foreign] authorities of their relevance").

We have repeatedly declined to adopt the joint venture doctrine in the context of the Fourth Amendment. *See Lee*, 2013 WL 2450533, at *4 n.4; *Maturo*, 982 F.2d at 61-62. As we have explained above, the purpose of the Fourth Amendment's exclusionary rule is "to inculcate a respect for the Constitution in the police of our own nation." *Lee*, 2013 WL 2450533, at *3 (internal quotation marks omitted); *see also* note 7, *ante*. This purpose of deterrence is not served in instances where American law enforcement officers, not intentionally seeking to evade our Constitution, participate in a so-called "joint venture" but do not direct or otherwise control the investigation. *See* Part II.A.ii, *ante*. We, therefore, decide again not to adopt the joint venture doctrine and, instead, reaffirm the longstanding principles of "virtual agency" and intentional constitutional evasion described in this opinion as the applicable analytic rubric to determine whether "cooperation with foreign law enforcement

officials may implicate constitutional restrictions."[10] *See Lee*, 2013 WL 2450533, at \*4; *Maturo*, 982 F.2d at 60-61.

For the reasons stated above, we conclude that the District Court did not err in denying defendant's motion to suppress the evidence gathered abroad by foreign law enforcement officials.

## B.  Procedural Error in Sentencing

Getto also challenges the procedural reasonableness of his sentence. "Criminal sentences are generally reviewed for reasonableness, which requires an examination of the length of the sentence (substantive reasonableness) as well as the procedure employed in arriving at the sentence (procedural reasonableness)." *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) (internal quotation marks omitted). As we have explained, "[a] district court commits procedural error where it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider

---

[10] We note that our holding declining to adopt the joint venture doctrine in the context of the *Fourth* Amendment does not bear upon our earlier jurisprudence adopting the doctrine in the context of *Fifth* Amendment. *See Lee*, 2013 WL 2450533, at \*4 n.4 ("Although our case law . . . implicitly adopted the joint venture theory in the context of suppressing overseas interrogations under the Fifth Amendment's Due Process Clause, we have not done so in the context of the Fourth Amendment." (citations and internal quotation marks omitted)); *see generally United States v. Verdugo–Urquidez*, 494 U.S. 259, 264 (1990) (noting that the Fourth Amendment "operates in a different manner than the Fifth Amendment"); *United States v. Yousef*, 327 F.3d 56, 145–46 (2d Cir. 2003) (adopting the joint venture doctrine in the Fifth Amendment context of suppressing statements elicited during overseas interrogations).

the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012) (relying on *Gall v. United States*, 552 U.S. 38, 51 (2007)). Getto argues that he was improperly sentenced based on the total number of victims and the collective loss amount attributable to the conspirators at all three boiler rooms, and that the District Court did not make the required particularized findings before attributing the activities at all three rooms to him.

A district court may sentence a defendant based on the reasonably foreseeable acts and omissions of his co-conspirators that were taken in relation to a conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B). Before sentencing a defendant based on the conduct of co-conspirators, however, a district court is "required to make two particularized findings . . . : (1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, co-conspirator conduct in question . . . ; and (2) that the relevant conduct on the part of the co-conspirator was foreseeable to the defendant." *United States v. Johnson*, 378 F.3d 230, 236 (2d Cir. 2004) (internal quotation marks, citations, and alterations omitted); *see also United States v. Studley*, 47 F.3d 569, 574-75 (2d Cir. 1995).

It is clear from a review of the transcript of the sentencing proceeding that the District Court did not make particularized findings relating to the scope of the activity or the foreseeability of the conduct of Getto, stating only that it had "no quarrel with the

[government's] conspiracy theory here from what I have read." Special App'x 33. This terse statement does not constitute particularized findings,[11] *see Johnson*, 378 F.3d at 236, and compels the conclusion that the District Court committed procedural error. Accordingly, we remand the cause with instructions to vacate defendant's sentence and proceed promptly to resentencing.

## CONCLUSION

To summarize, we hold that:

(1) Defendant's allegations that a foreign law enforcement agency conducted warrantless searches and surveillance abroad, even if credited, would not "shock the conscience" so as to require exclusion of the fruits of those activities under the Fourth Amendment.

(2) Ongoing collaboration between an American law enforcement agency and its foreign counterpart in the course of parallel investigations does not, without more, give rise to a relationship between the two entities sufficient to implicate the Fourth Amendment abroad because (a) a foreign law enforcement agency does not act as a "virtual agent" of American law enforcement where American

---

[11] We "note that the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991).

law enforcement officials do not control or direct the foreign law enforcement agency's investigation abroad; and (b) cooperation between the United States and foreign law enforcement agencies does not otherwise implicate the Fourth Amendment where the American officials do not *intend* to evade constitutional requirements.

(3) We do not adopt the "joint venture" doctrine in the context of the Fourth Amendment.

(4) The District Court erred by sentencing defendant based on the conduct of co-conspirators without making the requisite particularized findings, *see United States v. Johnson*, 378 F.3d 230, 236 (2d Cir. 2004), regarding the scope of the defendant's agreement in the conspiracy and the foreseeability to the defendant of the co-conspirators' conduct.

For the reasons stated above, we **AFFIRM** the District Court's March 29, 2011 judgment of conviction, and **REMAND** the cause with instructions to vacate the sentence and proceed promptly to resentence the defendant in a manner consistent with this opinion.